IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 28, 2005 Session

## LEROY HALL, JR. v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 222931     Stephen M. Bevil, Judge**

---

**No. E2004-01635-CCA-R3-PD - Filed August 22, 2005**

---

In 1992, a jury convicted the Petitioner, Leroy Hall, Jr., of first degree premeditated murder and aggravated arson, and it sentenced him to death for the first degree murder conviction. The trial court imposed a consecutive twenty-five year sentence for the aggravated arson conviction. On direct appeal, the Tennessee Supreme Court affirmed the Petitioner's convictions and sentences. See State v. Hall, 958 S.W.2d 679 (Tenn. 1997), *cert. denied*, 524 U.S. 941 (1998). The Petitioner filed a pro se petition for post-conviction relief, which was subsequently amended by appointed counsel. After an evidentiary hearing, the post-conviction court dismissed the petition. The Petitioner appeals that judgment, contending that: (1) his trial counsel rendered ineffective assistance at trial; (2) the post-conviction court erroneously denied the Petitioner's request for an expert attorney to establish his claim of ineffective assistance of counsel; and (3) the death sentence violates the Petitioner's rights under the federal and State constitutions and international law. After throughly reviewing the record and the applicable law, we conclude that there exists no reversible error. Accordingly, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and NORMA MCGEE OGLE, JJ., joined.

Donald E. Dawson and Paul J. Morrow, Nashville, Tennessee, for the appellant, Leroy Hall, Jr.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; William H. Cox, District Attorney General; Barry A. Steelman, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I.  Facts**
**A.  Facts on Direct Appeal**

As set forth in our Supreme Court's opinion on direct appeal, the proof at the Petitioner's trial established the following facts:

At around midnight on April 16, 1991, the defendant threw gasoline on the victim, Traci Crozier, his ex-girlfriend, as she was lying in the front seat of her car. The victim received third degree burns to more than ninety percent of her body and died several hours later in the hospital. When questioned by police, the defendant initially denied involvement in the offense. Eventually, however, [the Petitioner] admitted responsibility, but claimed that he did not intend to kill the victim; he intended to burn her car.

The victim met the defendant in December of 1984. They began living together in January of 1986, and continuously resided together until[] three weeks prior to her murder. On March 26, 1991, the victim left and moved into the house with her grandmother, Gloria Mathis, and her uncle, Chris Mathis. After the separation, the defendant would frequently, and often late at night, call the Mathis home in search of the victim. In the early morning hours of April 6, 1991, the Mathis household was awakened by a dog barking and looked outside to see the victim's car, a two-door Nissan Pulsar, burning. The victim's uncle saw the defendant running away from the burning car and fired a gunshot into the air. The fire department was called to extinguish the fire and investigate the arson. When the defendant called the Mathis house thereafter, the victim's uncle threatened [the Petitioner] in the event he did not leave the victim alone. The defendant responded: "If I can't have her, nobody can't." [sic]

On the night of April 16, 1991, shortly before midnight, Viola Wylene Price was sitting in her car outside her home when she saw "a ball of fire" in the middle of the street. As she started to get out of her car, a black car, later identified as being similar to the defendant's, sped away from the scene. After the car passed, Price ran into her house and called 911. Her son, Billy Ray Wilson, was inside and when he heard his mother call for emergency assistance, he ran outside to see what was happening. When he saw the burning car and heard someone inside it screaming for help, Wilson ran to the driver's side of the car. Though the door was open, he could not see anyone through the flames. Wilson ran around to the passenger side of the car where he saw the victim attempting to get out through the window. Wilson pulled the victim from the car, removed her burning shoes and clothes, helped her extinguish the flames on her body, and assisted her to a safe distance from the burning car in the event of an explosion.

Price returned to the scene after calling for emergency assistance. Though the victim had been so badly burned that her hair was melted and skin was hanging from her arms, she remained coherent and alert. The victim expressed concern about her appearance and the likelihood of permanent scarring from the burns. She gave Price her name and telephone number. When Price asked the victim for the identity of the perpetrator, the victim responded, "Lee Hall." The victim also told Price that [the

Petitioner] twice previously had set fire to her car. The victim told Wilson that the defendant "threw gas on me, gas bomb." She repeated, "it was gas, gas bomb. He set me on fire."

Earl Atchley, Commander of the Chattanooga Fire Department, received the 911 call at 12:06 a.m. on April 17, 1991. When he arrived at the scene the victim's car was "fully involved" in fire[,] and the victim was badly burned. Though Commander Atchley did not recognize her, the victim remembered him as the person who had investigated the burning of her car on April 6, 1991. The victim told Commander Atchley that the same person was responsible for both incidents. Commander Atchley recovered a melted plastic container next to the driver's side of the victim's car, and a tupperware lid, which was not as badly melted, near the car.

The victim was taken to Erlanger Hospital where she was treated by Dr. Sonya Merriman, a plastic surgeon and burn specialist. Describing the victim's condition, Dr. Merriman stated, "She had a 95 percent, what we call a total body surface area burn, 95 percent of her body was burned, and all but about two to three percent of that was third degree burns." The victim's teeth were charred, and the hair was burned off her body. Based upon the consistency and uniformity of the burns over the victim's entire body, except the soles of her feet, Dr. Merriman opined that the victim's body had been doused with gasoline, rather than splattered or splashed. Although Dr. Merriman had treated nearly one hundred burn cases, she had never seen a worse or more uniform pattern of burning on an individual.

The victim was treated with intravenous fluids and incisions in her body designed to allow tissue expansion. Nonetheless, the victim's condition deteriorated. Her tongue swelled until it protruded from her mouth, and her eyelids became inverted from the swelling. Despite the gravity and extent of her injuries, however, Dr. Merriman testified that the victim remained conscious. She was also in constant pain. According to Dr. Merriman, the medication administered to the victim would not have been strong enough to alleviate her pain, and the victim did not sleep for long periods of time or lose consciousness until just before her death. The victim, according to Dr. Merriman, sustained an unsurvivable burn from which there was never any chance of recovery.

Ed Forester, an investigator with the Arson Division of the Chattanooga Police Department, examined the victim's car after both the April 6 and April 16 fires. His investigation of the April 6 fire revealed that an accelerant had been poured around the exterior edges of the car which melted the fenders and bumpers. A yellow plastic jug found at the scene tested positive for gasoline. Forester obtained an arrest warrant for the defendant based, in part, upon the statements of the victim's uncle.

Forester testified that the vehicle burned on April 6 was the same automobile

involved in the fire on April 16, 1991. The most extensive damage resulting from the fire on April 16 was to the driver's side of the car. The metal was discolored; the roof sagged; and the seat springs were weakened. The glass on the passenger side was fire and carbon stained; however, glass found on the driver's side had no such markings. The lack of fire or carbon staining indicated that the glass on the driver's side had been broken out before the fire was started. A melted plastic container was found near the open driver's door of the victim's vehicle. The victim's socks, shoes, and clothing remains were recovered and later tested positive for the presence of gasoline. Car keys were found some thirty feet away from the victim's car.

Mike Donnelly, an arson investigator with the State of Tennessee Fire Marshall's Office, also examined the victim's car. He found evidence of three separate fires to the car. Based upon the extent of damage, Donnelly opined that the April 16 fire had been started on the driver's side of the vehicle. Based upon his examination of the car and his review of photographs of the victim, Donnelly testified that gasoline had been poured directly onto the victim.

Testifying for the defense during the guilt phase of the trial were Morris Forester and Jeffery Scott Green. Forester and Green had been drinking with the defendant in the early evening of April 16, 1991. The trio consumed about two and one-half cases of beer and were intoxicated. Forester went to bed around 10:30 p.m. and did not see the defendant thereafter. Green recalled seeing the defendant between 10:30 and 11:00 p.m. Because he knew the defendant was intoxicated and unable to drive, Green tried to persuade the defendant to spend the night at Forester's home. Eventually, however, the defendant left, and neither Green nor Forester saw him again until after the murder.

The defendant also testified in his own behalf. According to his testimony, he and the victim began living together in January of 1986, when he was eighteen and she was sixteen years old. Even though the victim moved out in March of 1991, they continued to see one another after the separation. The defendant said he was upset by the separation, and as a result, had been drinking and smoking crack cocaine. On the day of the murder, [the defendant] and Green went directly to Forester's house and began drinking beer. At one point, [the defendant] left and obtained a hammer at a pawn shop. After attempting to call the victim several times, without success, [the defendant] returned to Forester's home about 6:30 p.m. or 7:00 p.m. and continued drinking.

[The defendant] consumed approximately one case of beer, then left Forester's home, taking with him five more cans of beer. After purchasing another six cans of beer, [the defendant] drove to the mobile home he had shared with the victim and destroyed some of her possessions because he was angry with her for not coming home. [The defendant] left the trailer after a short time and took with him a

-4-

two-quart tea jug [that] he intended to use to burn the victim's car. Searching for the victim and her car, [the defendant] drove by her work place, her grandmother's house, and several bars, but he did not find her. [The defendant] was threatened by the victim's uncle and a second man whom he did not know when he drove by the victim's grandmother's house. Thereafter, [the defendant] stopped at a service station, filled the tea jug with gasoline, and purchased a cigarette lighter. [The defendant] removed paper towels from a dispenser near the gas pumps, placed them in the opening of the tea jug, put the container in his car, and returned to the area near the victim's grandmother's house.

As [the defendant] was preparing to leave the neighborhood, he encountered the victim as she drove up in her car. According to [the defendant], he left his car and entered the victim's car on the driver's side to talk. [The defendant] asked her to move back in with him and told her that he was drunk and needed her. He asked the victim if she was pregnant and told her that she could not have another abortion. Finally, [the defendant] questioned why he had been blamed for the earlier burnings of her car. An argument ensued. The victim called the defendant a "crazy S.O.B.," and [she] told him to turn himself into the authorities.

At that point, [the defendant] got out of her car and told the victim to do likewise because he was going to burn it. When the victim tried to lock the door, [the defendant] reached inside the car, grabbed the keys, threw them towards his car, and ordered the victim to get out of her car. [The defendant] then ran to his car and grabbed the jug of gasoline. He ignited the paper towels and threw the jug into the driver's side of the victim's car. The defendant knew the victim was lying in the front seat crying when he threw the gas bomb into the car.

According to the defendant, after he threw the gasoline jug, the victim came running toward him, out of the burning car, and caught him on fire. The defendant extinguished the flame on himself and then just looked at the victim, who[,] according to the defendant, ran to the passenger's side of the car, and rolled on the ground. Unsure of what to do and believing that the fire on the victim was almost extinguished, the defendant drove away from the scene. Although he claimed to have returned two or three minutes later, he did not see the victim, and he fled again when a black shadowy figure ran toward him.

On cross-examination, the defendant denied pouring gasoline onto the victim, claiming that it splattered on her when he threw the jug into the car. He also denied breaking the glass on the driver's window, insisting that the door was open. He proclaimed that he loved the victim and intended only to burn her car. The defendant admitted that he initially denied the offense when questioned by police. He also claimed to the police that he never meant to hurt the victim and had the gas bomb for protection from the victim's uncle, but he threw it at the victim after she laughed at

him.

Based upon the proof summarized above, the jury found the defendant guilty of first degree premeditated murder and aggravated arson.

The trial proceeded to the sentencing phase on the conviction for first degree murder. The State presented only one witness, Detective Ed Forester who had investigated and obtained warrants for [the defendant]'s arrest for the burning of the victim's car on April 1 and 6, 1991. According to Forester, at the time of the victim's murder, the defendant was aware that he was a suspect in the April 1 and 6 incidents. Forester also testified that the victim had given a statement following the April 6 fire in which she said that [the defendant] previously had threatened to kill her and to "total" her car, and, on one prior occasion, actually had tried to force her off the road.

The proof for the defense at sentencing included the testimony of Dr. Roger Meyer, a clinical psychologist, who evaluated the defendant after his arrest for this murder. Dr. Meyer interviewed [the defendant] for three hours and reviewed the results of tests administered to [the defendant] by one of Dr Meyer's associates.

Dr. Meyer testified that a mental status examination revealed that the defendant was not insane or psychotic. A Slosson Intelligence test indicated that the defendant's IQ was eighty-seven, and that his mental age was thirteen years, eleven months. The defendant's basic skills, as measured by a Wide Range Achievement test, showed a grade level 6 to 9 education in the general areas of reading, spelling, and arithmetic. A neuropsychological examination did not reveal any evidence of significant neurological trauma to [the defendant]'s brain. A sixteen-factor personality test revealed that [the defendant] is introverted, emotionally unstable, easily influenced, and has low self-esteem. According to Dr. Meyer, the test reflects that the defendant has little self-control and is not rule abiding or moralistic. Though the defendant is not a psychopath or sociopath, Dr. Meyer opined that [the defendant] has problems controlling rage and anger.

A Rorschach "Ink Blot" test showed that [the defendant] has a great deal of difficulty reacting appropriately to stressful situations. Dr. Meyer described [the defendant] and the victim's relationship as an "emotional tug of war," and [he] said that it would have created a great deal of tension and frustration in a person with the defendant's psychological makeup. Though some of the test results indicated that the defendant was "faking bad" or malingering, Dr. Meyer explained that such results do not necessarily mean that a patient is faking, but can also reflect that a patient is simply overemphasizing the stress and emotional problems he or she is experiencing.

Dr. Meyer diagnosed the defendant as suffering from borderline personality disorder. Dr. Meyer testified that persons with this disorder characteristically have severe

emotional problems and problems with thinking and judgment. Dr. Meyer also concluded that the defendant suffered from post-traumatic stress disorder, but admitted that it may have resulted from the circumstances of the victim's death.

On cross-examination, Dr. Meyer testified that the defendant is not mentally retarded. He also conceded that his conclusions about the defendant's mental condition were based, at least in part, upon a typographical error indicating that the defendant's IQ was seventy-eight (78), rather than eighty-seven (87). Despite his reliance upon this erroneous information, Dr. Meyer did not revise his conclusions about the defendant. He restated his diagnosis that the defendant exhibited signs often associated with borderline personality disorder and post-traumatic stress disorder and said that the defendant was under extreme emotional distress when he committed the murder in this case.

Dr. Meyer admitted, however, that he did not discuss the facts of the murder with the defendant, but considered only the events which occurred before and after the killing in making his diagnosis. Dr. Meyer also did not reconsider his diagnosis after receiving an investigator's report which chronicled the defendant's behavior since childhood. Dr. Meyer admitted that the behavior described in the report would support a diagnosis of antisocial personality disorder. The behavior included the defendant's burning of his own bed in 1972, setting fire to his mother's boyfriend's car seat in 1973, setting fire to a wooded area in 1975, driving under the influence of an intoxicant, fighting, sneaking up on his mother's boyfriend with a knife, and truancy.

In addition to Dr. Meyer's testimony, the defense also presented proof about the relationship between [the defendant] and the victim and about the defendant's abuse of drugs and alcohol. For example, Green testified that the victim and the defendant had a "rocky" relationship and that the defendant abused alcohol, marijuana, and crack cocaine. The defendant's cousin testified that [the defendant] came to live with him in Oklahoma in December of 1990 seeking employment and recovery from drug abuse, but the victim telephoned, and shortly thereafter, [the defendant] returned to Tennessee.

Christie Griffin, the defendant's step-sister, testified that [the defendant] was very sad when he and the victim were at odds, but [he] always believed they could work through their problems. According to Griffin, Hall and the victim had been out together several times following their separation in the weeks prior to the murder. Griffin stated on cross-examination that she observed the defendant hiding his shirt when he returned to his mother's home on the night of the victim's murder. In fact, Griffin had told the police where the shirt had been hidden.

The defendant's brother, David Hall, said that the defendant and the victim argued

once a week, and the victim would address the defendant in abusive and vulgar language. According to his brother, the defendant was abusing crack cocaine during the time period of the murder, and had been for sometime prior to the murder. To support that drug habit, [the defendant] would borrow money and pawn property.

The defendant's mother, Sarah Griffin, testified that her family had moved several times when [the defendant] was young. When [the defendant]'s family moved to Alabama, he was only fourteen years old, but he remained in the Chattanooga area, residing with another family for three years until his own family returned. According to [the defendant]'s mother, the victim and her son began having problems two years before the murder. The couple had separated and reconciled on several occasions. She recalled that in December of 1990, the defendant moved to Oklahoma, where he planned to find employment and help for his drug problem, but [he] returned in early January of 1991 to reconcile with the victim. During the separation preceding the murder, Griffin testified that [the defendant] was very upset and would often cry and drink alcohol in excess. Although the victim and the defendant were separated, they had been out together several times in the weeks before the murder. According to Griffin, [the defendant] was a "basket case" when he was unable to see the victim.

Finally, the defense introduced medical records and insurance forms to establish that the victim had undergone two abortions in 1985 and one abortion in 1990. The prosecution, in rebuttal, presented the testimony of a friend of the victim who related that [the defendant] was aware of one of the abortions in 1985 and had encouraged the victim to undergo the procedure.

Hall, 958 S.W.2d at 683-88.

## B. Facts from Post-Conviction Proceedings

On August 17, 1998, the Petitioner filed a pro se petition for post-conviction relief. The Petitioner alleged that: (1) the prosecution failed to disclose exculpatory evidence before trial; (2) the grand or petit jury in his case was unconstitutionally selected and impaneled; and (3) he was denied the effective assistance of trial counsel. The trial court appointed the Office of the Post-Conviction Defender, namely Donald E. Dawson and Paul J. Morrow, to represent the Petitioner. On September 20, 1999, the Petitioner's post-conviction counsel filed an amended post-conviction petition presenting additional claims of ineffective assistance of trial counsel and alleging that the State failed to preserve certain exculpatory evidence and to provide other exculpatory evidence to the defense.

At the hearing on the Petitioner's post-conviction petition, which was held on May 13, 2002, William Robert Heck ("Counsel") testified that he was an attorney, and he had practiced primarily criminal law for the past twenty-eight years. He said that he was initially contacted, and subsequently retained, by the Petitioner's family to represent the Petitioner at the preliminary hearing

of this case. Thereafter, the trial court appointed Counsel as trial counsel, and it appointed Assistant Public Defender Karla Gothard ("Co-counsel") as co-counsel. Counsel said that he had tried several cases before the Petitioner's that began as capital cases, but, in each case, the State decided not to pursue the death penalty. In addition, Counsel said that he had regularly attended seminars on death penalty litigation for several years, including one that he attended while he represented the Petitioner. Counsel testified that he investigated the Petitioner's case himself, and he hired Colin Mitchell, a former probation officer, to assist him. He noted that investigators in the Public Defender's Office also worked on the case. Counsel said that he sought a psychologist to evaluate the Petitioner's mental functioning and the potential for some type of insanity defense. On Investigator Mitchell's recommendation, Counsel consulted with Dr. Meyer, but he later learned that the doctor was not a clinical psychologist. Counsel stated that he filed a motion for an examination of the Petitioner by a State psychologist, but he withdrew the motion on the advice of a colleague. He did not recall contacting other criminal defense lawyers for recommendations on expert psychologists. Counsel explained that, at the time of the Petitioner's trial, the process of obtaining funds for expert witnesses was different in that, then, appointed trial attorneys were required to justify independent experts because State experts were normally used.

Counsel said that, to prepare for this trial, he utilized the Capital Case Resource Manual and "volumes" of other materials. He did not seek a mitigation specialist, and he did not recall that the authorization of expenses for such witnesses was routinely granted by trial courts at the time. To further prepare for trial, Counsel examined the victim's burned car, consulted with a TVA engineer, and regularly stopped by the Police Services Center to try to get other information and to talk with people who were knowledgeable about fires. Counsel recalled that the engineer from TVA "seemed to know a great deal about fire and explosives," but he did not recall the man's education or the basis of his knowledge. Counsel recalled that the engineer was suspicious of the Petitioner's story because he did not believe that a coke bottle, which the Petitioner claimed to have used to ignite this fire, would have caused the type of explosion that killed the victim. According to Counsel, "the information that I got [from the investigation] . . . I did not want to use . . . at trial [because] it was just further damning to [the Petitioner]."

Counsel did not recall how often he conferred with Co-counsel about the case. He said that, although he sought Co-counsel's input, it was her first capital case, and "she was pretty inexperienced." Counsel said it was possible that he and Co-counsel had worked together on one other capital case before the Petitioner's case.

Counsel testified that the facts of the case were "so atrocious" that everything went against a defense. He said that he looked for anything to generate any degree of sympathy for the Petitioner, and he examined the victim's behavior in pursuit of a theory that the Petitioner was driven to his actions by temporary insanity. Counsel agreed that the issue at trial involved the Petitioner's mental state and whether the murder was premeditated or part of a felony murder. He said there was a question of how the gas was placed into the victim's car, but his own investigation showed that the Petitioner's version of events was inconsistent with the proof. He stated that it was not until well into the trial, on cross-examination, that the Petitioner told a "completely different story . . . ."

Counsel noted that he had interviewed the list of friends the Petitioner gave him, but "almost . . . [every] one . . . told me the same story, that they had heard [the Petitioner] threaten to kill [the victim]."

Regarding Dr. Meyer, Counsel said he met with the doctor several times, visited his office, and met with the doctor's associate, who had performed the Petitioner's testing. Counsel explained that he thought he "had gotten from Dr. Meyer what I needed and it turned out that I did not." Counsel said that it was unnecessary for him to meet with Dr. Meyer regularly each month. He did not recall discussing with Dr. Meyer or Investigator Mitchell the inconsistencies between the Petitioner's statements and the physical evidence. Counsel said that, before Dr. Meyer testified at trial, he conferred with the doctor about the Petitioner's low intelligence and impulsive tendencies. Based in part on his meeting with the doctor, Counsel said that the defense theory he formulated was that the Petitioner "was not in a position to really formulate the intent necessary to have done this," considering the Petitioner's extremely marginal intellect and the fact that he drank and used drugs on a regular basis. Further, background research showed that the Petitioner was "incapable of really any self-control."

Counsel did not recall interviewing any witnesses present at the time of the fire other than the Petitioner. In investigating the Petitioner's background, Counsel found that the Petitioner's family was dysfunctional and moved frequently. At one time, the Petitioner lived with a local bowling alley owner, Sonny Hughes. The Petitioner's mother voiced concern that Hughes had sexually abused the Petitioner. Counsel testified that the Petitioner denied any abuse, and Counsel was unable to locate Hughes. Counsel stated that he was aware that the Petitioner had set other fires and destroyed the victim's property, including previously burning her car. He did not recall discussing the issue of sexual abuse with Dr. Meyer, and he did not consider pursuing a sexual abuse theory to defend or mitigate the Petitioner's actions.

Counsel said he did not consider hiring an expert on alcohol or drug abuse or a general mitigation expert. He recalled interviewing before trial the victim's treating physician, Dr. Merriman, but he did not interview Dr. Metcalfe, the physician who performed the autopsy. Counsel did not recall whether Dr. Metcalfe's testimony contradicted Dr. Merriman's testimony about whether the gasoline was actually poured on the victim. Counsel noted that he sought to have Dr. Meyer testify at the guilt phase about the Petitioner's mental state at the time of the murder, but the trial court denied his motion. Counsel explained that he did not make a proffer of Dr. Meyer's proposed testimony for the record.

Counsel testified about memos that he wrote in preparation for trial, and he noted that, according to those memos, the Petitioner regularly drank alcohol and took drugs and reported consuming about twenty-two beers on the night of the murder. The memos detailed various aspects of the case, including Counsel's conversations with the investigator and a meeting between Counsel, the investigator, and the Petitioner to research the Petitioner's social, educational, and family background. Counsel stated that, at these meetings, the Petitioner provided his own detailed account of the crime and its surrounding circumstances. Counsel testified about additional memos that

detailed the investigator's meetings with the Petitioner's mother and stepmother, during which the two women noted other incidences where the Petitioner burned property. The women also articulated the history of the Petitioner's relationship with the victim, including his being extremely upset by her having several abortions during their time together.

When questioned about the fee claim that Counsel submitted, Counsel noted that he was appointed on July 1, 1991, and he was paid in May 1993, when the claim was approved. He said the contents of the claim were accurate as to the work performed and time claimed, but he noted that some of the dates might not correspond completely with the dates that work was actually done. Counsel said that, at the time he represented the Petitioner, he was a sole practitioner, and he worked on other cases, including another death penalty case that was then being appealed to the Supreme Court. He said that the fee claim was accurate if it showed, for example, that he worked 235 hours on the case during July 1991 and eight hours per day nearly every day in August 1991. Counsel said that, if the claim form reflected 76 contacts with his investigator during the case, "that might be a little bit high," but said that thirty-eight contacts with Co-counsel and fifteen contacts with Dr. Meyer sounded accurate.

Regarding Dr. Merriman's testimony that the victim's injuries were the result of being doused rather than splattered with gasoline, Counsel said that he did not question the doctor's conclusion because it was within her area of expertise and because he did not want to reemphasize her testimony for tactical reasons. Counsel agreed that he was aware, before the trial, that Dr. Merriman's testimony was inconsistent with the pathologist's belief that the gasoline was thrown at, not poured on, the victim. Counsel said that he did not know until trial, however, that the Petitioner was going to change his testimony and make the question of pouring versus throwing the gasoline an issue for the jury. Counsel said that he intentionally did not tell the jury in his opening statement of the sentencing phase what mitigation proof would be presented in order to save that proof for the end and to avoid being "pinned down" by saying something the proof might not support.

On cross-examination, Counsel said that he was in contact with the Capital Case Resource Center, and he contacted other attorneys, including Paul Morrow, who was the Petitioner's counsel in this post-conviction proceeding, about the Petitioner's case. He said that he followed Morrow's advice to hire an independent expert, rather than use a State psychologist, for a mental evaluation because the advice was well-founded. Counsel agreed that his trial strategy was multi-faceted, and he tried to engender some sympathy for the Petitioner, but he never felt that the Petitioner would be able to escape all criminal responsibility for his actions. Counsel also tried to mitigate the offense, and avoid the death sentence, by showing that the Petitioner lacked the capacity for premeditation. He also sought to attribute the Petitioner's actions, partly, to the pressure of his stressful relationship with the victim. He said his efforts were made more difficult because some of the information the Petitioner told him was either untrue or inaccurate. Counsel said that neither he nor the State could establish whether the victim was doused or splattered with gasoline because the effect was the same. Counsel agreed that the best evidence that gas was thrown at the victim was a statement from the victim to a witness indicating that the Petitioner threw gas at her.

Counsel discussed his fee claim, and he said that, if anything, the hours reflected on his claim were "probably a little bit short" of the time he actually worked on the case. Counsel disputed any inference that he was "padding" his fee claim because he needed the money. He explained that, when he was appointed to represent the Petitioner, he had substantial income from several personal injury cases. Counsel estimated that he worked over one thousand hours on the Petitioner's case.

Co-counsel testified that she had practiced law since May 1981, and she began working at the public defender's office in September 1989, where she was currently the "chief assistant." In July 1991, she was appointed as Co-counsel in this case, and, at that time, she had a very heavy caseload. At the time she was appointed to the Petitioner's case, Co-counsel was working on another capital case with Counsel, State v. Amos Copenny, 88 S.W.2d 450 (Tenn. Crim. App. 1993). Co-counsel said that, in the Copenny case, there was a problem with an investigator from her office, who was later terminated, whose actions gave the impression that the defense was paying witnesses for their testimony. Co-counsel said that, as a result, she felt that Counsel did not trust her or her office when the two were appointed to work on the Petitioner's case together. She noted Counsel did not set appointments to discuss the case with her, and he did not give her the discovery material. Co-counsel felt there was a "total breakdown of communication" between herself and Counsel concerning the Petitioner's case. She stated that it was not until the trial was in progress that she felt that Counsel began to appreciate her efforts and distrust her less.

Co-counsel testified that, since she had worked on the Petitioner's case, she now would organize a team in death penalty cases, and she would use as many of the resources from and outside her office as possible. This included obtaining separate guilt phase and sentencing phase investigators, a mitigation specialist, and other necessary experts. She said everyone on her team would meet regularly in preparation for trial and sentencing. Concerning the Petitioner's case, Co-counsel testified that meetings she had with Counsel were informal and took place in hallways. She said her notes indicated that investigators from her office only worked on the case during the trial itself and not before "for lack of information." Her calendar indicated the only "real," scheduled meeting she had with Counsel was in her office on February 28, 1992, just before trial began on March 3, 1992. The Petitioner told Co-counsel that he had been instructed not to talk to her. She was unaware who was a member of the "defense team," and she did not know who was being hired as an expert or a private investigator until after the fact. She stated she did not "want to sound like I'm dumping everything on [Counsel]," but she felt, in retrospect, that she should have informed the trial court that she "felt totally useless" because she had very limited knowledge of the case.

As to theories of the case, she recalled that the State made "a very large issue" of the fact that the Petitioner poured gasoline on the victim and then lit the gasoline. She noted some evidence supported the State's theory, but the defense had information, such as contrary statements from the medical examiner, that could have been developed further to show that the Petitioner's intent was to burn the car to keep the victim from leaving him, not to kill her. Based on notations in her calendar and her own recollection, Co-counsel denied meeting with Counsel on numerous occasions, as reflected throughout his fee claim. She noted that she was either in court on other matters or out of the office entirely on several dates when Counsel indicated they had met.

On cross-examination, Co-counsel stated that since she was not required to keep billable hours, she would not have noted meetings in her case files in addition to her calendar. She said she never approached the trial judge to tell him she had little contact with Counsel and felt she was unprepared for the Petitioner's case. As to overall representation of the Petitioner, Co-counsel said that neither she nor Counsel were effective. Co-counsel agreed that in the Copenny case, Counsel was effective in having the jury return a second degree murder conviction despite the fact that he did not use the "team approach" or a mitigation specialist in that case.

Co-counsel continued, stating that she had spoken at regional death penalty conferences about putting together a defense team in capital cases, and she noted that she was a past president of TACDL. Co-counsel stated that she had a "spiritual objection" to the death penalty, and she felt it was "grossly unfair" because it is used mainly against poor people, and it is "too political." Returning to her calendar, Co-counsel said she did not have the time to document everything she did on a case. She noted that specific notations, such as research or visits to the scene, were noted on a separate sheet in a file that had been missing from the archives for several years.

Co-counsel stated that she did not recall any times when Counsel made unannounced visits to her office and they discussed the case. She said that, when she was asked her opinion about whether the Petitioner should file a post-conviction petition, she informed post-conviction counsel that she felt she had been ineffective at trial. She recalled that, at a hearing where the Petitioner attempted to enter a guilty plea, she thought of the idea of advising the Petitioner to plead guilty to felony murder and arson in front of the jury in an effort to have the jury believe that this was a felony murder case, and the Petitioner was taking responsibility for his actions. She noted that she and Counsel did not have much time to discuss and explain the strategy with the Petitioner, and, ultimately, the trial court found the plea was not voluntarily entered and did not accept the plea. She learned, in the following years, that this was not an accepted or good strategy in a capital case because it removed any possibility of lingering doubt in a juror. At the time, she believed it was reasonable to think the jury would find the Petitioner guilty of felony rather than premeditated murder.

Co-counsel said that she received a memo from her investigator during the trial about unfavorable information that Sonny Hughes gave him about the Petitioner. She stated that, if she had had more time, she would have investigated neighbors, friends, and acquaintances to find out whether allegations of sexual abuse by Hughes were true, even though the Petitioner had denied these allegations. She stated that she did not receive Investigator Mitchell's report until trial. Co-counsel said that, although it was important that the defense had a witness who testified that the victim told him the Petitioner "threw" gas on her, it would have been more effective to have an expert refute the State's expert's testimony that the gas was poured, rather than thrown, on the victim. She said that, although Counsel testified that he talked with a structural engineer, she recalled during trial that Counsel said that he wished the defense had considered bringing in an arson expert. Co-counsel felt that she had been effective in her three capital cases following the Petitioner's case. She explained that she was ineffective in his case by allowing inadequate investigation and by relying too much on Counsel's assertions that things were being handled. She

felt that she was actively hampered in working on the case by Counsel.

Reviewing the report prepared by Investigator Mitchell, Co-counsel said it appeared essentially to be a summary of the Petitioner's social history, and she would have wanted more details and follow-up investigation to prepare for a defense or mitigation. When questioned by the post-conviction court, Co-counsel stated that there was a focus on having a defense team in capital cases at the time of Petitioner's trial. She agreed that if the jury had returned a life sentence, there would likely be no issue of her effectiveness.

Dr. Frank King, the Hamilton County Medical Examiner, testified that he was a forensic pathologist. He said that he had experience with examining burn injuries to both deceased and surviving victims, and he had some knowledge of how fires originated. He noted that Dr. Metcalfe performed the autopsy of the victim in the present case. Dr. King said he personally viewed the victim's body and reviewed the case at the request of the Petitioner's post-conviction counsel. Based on his investigation and reports, Dr. King opined that the fire was caused by "an igniting of gasoline in the setting of the inside of a car, the [victim] being present in the car and burned up by the gasoline fire." He said that he disagreed with Dr. Merriman's testimony at trial that the burns over the victim's body indicated that she was doused rather than splattered with gasoline. He explained that the injuries were so extensive that there was no pattern from which to interpret the evidence in this manner. On cross-examination, Dr. King testified that statements from the victim before she died should be given a lot of weight in evaluating how she was injured and were useful to assist the jury in determining whether the death was a homicide.

Investigator Colin Mitchell testified that he had a degree in counseling, and he had previously worked as a State probation officer for fifteen years and as a licensed private investigator from 1989 until 1992. Before the Petitioner's case, Mitchell said he worked with Counsel in another murder case, State v. Willy Sparks, No. 03501-9212-CR-00105, 1993 WL 151324 (Tenn. Crim. App., at Knoxville, May 10, 1993). He described his role in the Petitioner's case as "developing a presentence style investigation" and gathering the information necessary to defend the Petitioner. He said the trial court approved him to work at a capped salary of $1,500, and he was required to keep detailed time records. He said he was very careful about logging any of his work on the case. Investigator Mitchell felt that the guilt issue "was pretty much a no-brainer," but the penalty phase depended on the development of mitigating cirucmstances. He did not recall attending any "actual sit-down meetings" with Counsel and Co-counsel to prepare for trial, and he did not meet with investigators from the public defender's office. The investigator said he followed Counsel's instructions regarding his work "but as far as me offering input and him considering it, it was pretty much a one-way street." He said Counsel "pick[ed] [his] brain" about the Petitioner's psychology and the effects of his crack cocaine use, but not on matters of defense strategy. He recalled speaking with Dr. Meyer, but not meeting with him. Investigator Mitchell said that he was never paid for his work on the case because he had a "falling out" with Counsel before trial. Mitchell said that he believed this was the result of jealousies that occurred after he introduced Counsel to a female friend of his, and she and Counsel became close. He also noted that he turned in his time sheet to Counsel and "it came back very different"than the time sheet that Investigator Mitchell had supplied to

Counsel. Mitchell said "it looked like it was more than I was justified in obtaining." He said he felt threatened and left the case shortly thereafter. He said he did not feel welcome to attend the trial and did not understand Counsel's increasing anger towards him. He explained that he would not sign the bill Counsel prepared for him to submit to the State because it reflected more time than he had actually worked and "more vague time, more difficult-to-track time," with which he could not agree.

On further examination, Investigator Mitchell testified that the statement Counsel prepared for him was in narrative form and did not reflect the date, nature, time, or mileage of the activity shown. The investigator said that he "looked at it enough to know it wasn't kosher," and said he stood by his own time logs. On redirect-examination, Investigator Mitchell compared his time logs to entries involving him as listed on Counsel's fee claim form. He noted various instances in which the two documents did not correspond and where he did not recall meetings taking place or work as documented by Counsel. The investigator said that he did not record the specific nature or substance of his contacts with witnesses and others on his time log.

Donald Ray McBurnett testified that he was the Petitioner's cousin, and he lived with the Petitioner and his brother at different times growing up. McBurnett said the Petitioner was very possessive of his mother and had difficulty dealing with his parents' divorce. He said the Petitioner and the victim seemed very happy and were living together in 1985. A few years later, McBurnett said the Petitioner was getting more nervous, as he had been as a child. He said that the Petitioner was a "very hard worker." At some point, the Petitioner began using drugs and made plans to go live in Oklahoma with McBurnett, to find a job, and to straighten up his life. McBurnett recalled that, prior to the Petitioner's trial, he met with his aunt, uncle, and Counsel in Counsel's office. On cross-examination, McBurnett said he and Counsel discussed his testifying about the Petitioner returning to Oklahoma with him, the victim asking the Petitioner to return to Tennessee, and the Petitioner's drug problem.

John Hartley testified that he had known the Petitioner since they attended the fifth grade together. He said he and the Petitioner began drinking alcohol and using marijuana together at age sixteen. Hartley said that the Petitioner moved in with Sonny Hughes, a local bowling alley owner, after which the Petitioner began wearing nicer clothes and having more games and things. Hughes allowed the Petitioner to do as he pleased. Hartley said that he and the Petitioner went to a party where the Petitioner met the victim, and the Petitioner and victim began to date. Hartley said the Petitioner and the victim loved each other, but they bickered constantly, and the victim called the Petitioner names. Hartley described the victim as dominant in the relationship. Hartley said he and the Petitioner began using cocaine, and the victim would occasionally take part in such activity. He said that before using cocaine, the Petitioner was very neat and took care of everything, but then "started letting things slack." Hartley said the cocaine took over, and the Petitioner was addicted. Hartley said that he was subpoenaed for the Petitioner's trial, and he met with Counsel just before the trial began, along with other family members and friends. He recalled that he discussed his testimony with Counsel briefly, but he was never called to testify at trial. Hartley testified that he and the Petitioner were "loners" at school and were kind of poor. He said he never heard the Petitioner threaten to kill the victim.

David Hall testified that he was the Petitioner's older brother, and, growing up, he shared a bedroom with the Petitioner, whom he described as neat and particular. Hall said that, when their mother remarried, the Petitioner was jealous of her new husband. The Petitioner did not like school, and he made up reasons to stay home with his mother instead. Hall said when the Petitioner was between the ages of ten and fourteen, the Petitioner threw tantrums and had a temper that sometimes required his grandmother or father to calm him. Hall said that his paternal grandmother was always nervous and fidgety and was a "clean freak." He said the family moved about twenty-five times in five years when they were in grade school, and the Petitioner had a hard time adjusting. Hall observed the Petitioner being less shy and more happy after he began drinking. In 1980, their mother was going to move the family again and allowed the Petitioner to stay and move in with Hughes, the Petitioner's employer, because the Petitioner did not want to move again. Hall said that Hughes got drunk almost every night, and he observed Hughes inappropriately touching the Petitioner in the groin area. Hall said that Hughes had tried the same thing with him. He stated that he and the Petitioner never discussed the issue because they were "too embarrassed."

Hall testified that the Petitioner and the victim had a relationship that was good sometimes and bad other times. He stated that the two had physical fights that the victim usually started and that "she wasn't scared of [the Petitioner] at all." Hall said that the victim often cussed and called the Petitioner names in front of his family and friends, and the Petitioner usually would "cow down." He stated the Petitioner became nervous and fidgety when he began using cocaine, and the symptoms got worse when he used crack cocaine. Hall testified that the Petitioner first got his drugs free of charge, but he began using so much that he had to pay for more drugs, causing him to lose everything. Hall said that he saw the Petitioner two days before the victim's death, and the Petitioner was trying to "straighten up" and had two jobs. Hall stated that he met with Investigator Mitchell a few months after the Petitioner's arrest and with Counsel on the morning the trial began. He said Counsel spoke to the group of people meeting prior to the Petitioner's trial for "a few minutes" about what he would ask them "and then he wound up not really asking us nothing about it." Hall stated that he testified near the end of the trial in the sentencing phase.

Calvin Steele testified that he first met the Petitioner at Hughes' bowling alley when Steele was about ten years old and the Petitioner was a "couple years older." Steele said his father and Hughes were friends and drank heavily together very often. In an offer of proof, Steele testified that, one time, when he and the Petitioner spent the night at Hughes' house, Hughes came into their room late at night and touched and placed his mouth on Steele's groin area. Steele stated that he and the Petitioner had just said goodnight, and he believed the Petitioner was awake during the incident. Steele said that he also observed Hughes touching David Hall in his genital area. Steele said that, one time, he and the Petitioner went to Atlanta with Hughes, and the three shared a motel room. He said they had only been there a few hours and were "cutting up," when Hughes came over to Steele, unzipped Steele's pants and "tried to complete the same thing that he had done" to him before. Steele said that the Petitioner was standing directly behind Hughes, and the Petitioner's eyes were "wide open." Steele said that he met the victim when she and the Petitioner first lived together, and they did "really well together."

Shelly Moore testified that she knew the Petitioner and his brother in high school. During a time that the Petitioner and victim were broken up, the Petitioner dated Moore's best friend, Angie Short. Moore stated that she and her date once went on a date with Short and the Petitioner, and the victim observed Short sitting in the Petitioner's car outside a convenience store. Moore stated that the victim began beating on the car windows and then went inside the store and confronted the Petitioner who was buying beer and "trying to hide from her." Moore said that the Petitioner and the victim exited the store, and the victim was "smacking" the Petitioner around. Moore observed the victim following the Petitioner's car a few times, acting like she would rear-end the car. Later, she saw the victim belittling the Petitioner for cleaning up the trailer she was then sharing with the Petitioner. Moore said that the Petitioner was always a "wimp" and was shy around women. She said she would have testified at the trial if subpoenaed. On cross-examination, Moore stated that she would have testified that the victim was very aggressive toward the Petitioner and was physically and verbally abusive toward him.

Sherrie Conner testified that she was the Petitioner's cousin, and she had been around him all his life. She said that the Petitioner always clung to his mother, and he was affectionate towards his mother and later toward women in general. She observed the Petitioner with the victim during the Christmas before the victim's death, and the Petitioner was sitting by himself with a "glazed" look in his eyes, as though he were on medication. She stated that the other men in her family had a drinking problem, including her brother, her uncle, and another cousin. Conner stated that she was never contacted by anyone from the Petitioner's defense, but she would have been available to testify at the Petitioner's trial.

Allen Miller testified that he worked on the Petitioner's case as an investigator for the public defender's office. The day before the Petitioner's trial began, he went to Atlanta and delivered subpoenas to clinics where the victim may have had abortions. He did not recall meeting with Counsel about the case, and he recalled only having "conferences" in hallways and discussing strategies during the trial itself. Miller stated that another investigator, Charles Starnes, was asked to resign from the public defender's office as a result of his work for the office on a prior case. Starnes was replaced by Randy Milsaps, who worked with Miller on the Petitioner's case. Miller testified it was normal for other investigators to be appointed to a case so that the public defender's investigators were not the primary investigators. On further questioning, Miller said that, in most capital cases, the public defender's investigators were utilized more than they were in the Petitioner's case.

Randy Milsaps, another investigator for the public defender's office, recalled that he was asked to obtain insurance records relevant to the Petitioner's case. He did not recall attending any defense meetings with either Counsel or Co-counsel.

Dr. James Kenneth Metcalfe testified that he served as Hamilton County Medical Examiner in 1985, and he was a medical examiner in North Georgia from 1980 until 1990. Dr. Metcalfe was accepted as an expert forensic patholigst. He said that he performed the victim's autopsy, and he was later contacted by post-conviction counsel to examine pictures of the victim's body and the burned

car before the post-conviction hearing. As a result of this examination, Dr. Metcalfe concluded that the gas had been thrown, and not poured, on the victim. He also viewed pictures of the Petitioner's hands, arms, and skin and saw no burns or anything that indicated that the Petitioner was touching, or in the immediate vicinity of, the victim's car when it was burned. Dr. Metcalfe stated that he was not called as a defense witness at, or interviewed for, the trial. On cross-examination, Dr. Metcalfe agreed that another examiner might reach different conclusions. He said he may have told the investigator that, although he could not be certain, he thought the gasoline was thrown rather than poured.

Hamilton County Sheriff John Cupp testified that, based on his 1991 calendar, his only scheduled appointment on July 15 was with a chiropractor. He said that he was on vacation from November eighth until November fifteenth of that year. Sheriff Cupp said that he spoke with Counsel two or three times about the Petitioner's drug use while Counsel represented the Petitioner. These meetings took place in the courtroom hallway and were not prescheduled.

Dr. Roger Meyer testified that he worked as a clinical psychologist on the Petitioner's case. He said that he was contacted by Counsel, and he kept time records of his work. He did not recall any of the meetings or discussions with Counsel that were reflected on Counsel's time sheet. Dr. Meyer noted that he met with Counsel once before trial for an hour, and they reviewed the Petitioner's test results, Dr. Meyer's report, and the doctor's proposed trial testimony. Dr. Meyer said he may have also spoken with Co-counsel. Dr. Meyer testified that he was unaware of the defense strategy other than that it would include his evaluation of the Petitioner. He said that Counsel directed him not to discuss the Petitioner's crime at the trial. The doctor recalled that Counsel also wanted him to testify in the guilt phase of the Petitioner's trial, but he did not recall on what subject. He said he was familiar with the concept of diminished capacity and to make such an assessment, he would need to know the details of the crime. Dr. Meyer said he testified at trial that the Petitioner had "an elevated F scale," which could be attributed to a person either "faking" or crying out for help. He said that any sexual abuse in the Petitioner's past was another possible explanation.

On cross-examination, Dr. Meyer said he was made aware of possible sexual abuse in the Petitioner's case after he had completed his evaluation. He said that, in all his other cases, the attorney would share with him what information was sought and why it was needed so that he could determine the best type of evaluation to undertake. After receiving the results, he was usually asked to clarify anything the attorney did not understand. Dr. Meyer stated he got the "very definite" impression that Counsel did not understand the Petitioner's test results. He agreed that he testified at trial that the Petitioner had borderline personality disorder and that he was emotionally manipulated by the victim, including his desire to have a family with her and her having repeated abortions. On questioning from the post-conviction court, Dr. Meyer said that, contrary to most of his cases, he began the Petitioner's case with no preconceived notion of anything specific to look for. He noted that he received the Petitioner's personal history prepared by Investigator Mitchell along with the Petitioner's school records after he had completed his own report.

Dr. Thomas Pendergrass, a clinical psychologist and registered nurse, testified as an expert psychologist. In preparation for the post-conviction proceeding, he met with the Petitioner, who was incarcerated, over a period of three days. Dr. Pendergrass conducted a complete psychological interview and administered standardized tests, he reviewed the trial transcript from the Petitioner's trial, and he reviewed the Petitioner's friends' interviews. The doctor said that the fact that the Petitioner's grandmother was diagnosed as suffering from paranoid schizophrenia would show a family tendency of difficulty with emotional functioning. Further, records indicated that the Petitioner's father had difficulticulty functioning in the military and was discharged as a result. Dr. Pendergrass said that family interviews and other documents reflected that the Petitioner was in a "very chaotic situation" while the Petitioner's parents were married, and the Petitioner witnessed verbal and physical abuse toward his mother. Dr. Pendergrass reported that, after the Petitioner's parents' divorce when the Petitioner was seven, the Petitioner became overwhelmed, fearful, and clung to his mother. The Petitioner had increased anxiety-driven behavior, such as destructive efforts to avoid going to school. Dr. Pendergrass said that the Petitioner was very neat and orderly from an early age, and this was one way that he coped with his environment. He noted that at age thirteen, the Petitioner's anxiety-related issues worsened when his mother remarried.

Dr. Pendergrass said that there were several instances when the Petitioner burned property, the first of which occurred when the Petitioner was ten. The doctor characterized this as a form of the Petitioner impulsively managing the stressors in his life. He noted that the family moved multiple times while the Petitioner's parents were married, and, during junior high school, the Petitioner began using alcohol and later marijuana as his disruptive behavior increased. Dr. Pendergrass said that the Petitioner denied that he was sexually abused by Hughes, but the doctor noted that this was a very common response in abuse victims, and there was an acknowledgment of sexual abuse on one of the tests he administered. The doctor testified that, according to the Petitioner and other reports, the Petitioner's relationship with the victim was very volatile. Dr. Pendergrass explained that the relationship paralleled the Petitioner's relationship with his mother in that the Petitioner was very dependent on the victim and had an over-reactive fear of abandonment. For example, the Petitioner would throw out or burn the victim's belongings when she would leave him. Dr. Pendergrass noted that both the Petitioner and others indicated many physical and verbal fights, and they said that the victim was generally the aggressor. The doctor did not find indications that the Petitioner physically retaliated against the victim. Dr. Pendergrass said that, when discussing the victim's death, the Petitioner became withdrawn, agitated, at times tearful, and emotionally overwhelmed, and he said this did not appear to be contrived. The Petitioner's IQ was in the low average range, and he was socially and emotionally naive, meaning that he processed information very slowly and not necessarily reasonably. Dr. Pendergrass stated that, on the night of the victim's death, the Petitioner reported that he wanted to find her and get her attention by burning her car.

On cross-examination, Dr. Pendergrass stated he had a copy of Investigator Mitchell's report when he conducted his evaluation and his own evaluation was very consistent with the social history articulated in Investigator Mitchell's report. Dr. Pendergrass said that his findings were consistent with those of Dr. Meyer, but his findings included "an additional depth of information." He agreed

that it would be difficult to argue that the Petitioner was a victim of sexual abuse at trial if the Petitioner repeatedly denied the allegations. He also agreed that, although the Petitioner reported drinking heavily on the day the victim was burned, he was able to form the specific intent to locate the victim and to obtain gasoline, indicating some planning. On further examination, Dr. Pendergrass said that the Petitioner's history of burning property was directed to objects rather than persons, which was consistent with the Petitioner's statements that his intent was to burn the victim's car that night. Dr. Pendergrass testified that obtaining information from collateral sources was important in his attempt to verify behaviors, reactions, and situations reported by the Petitioner to ensure that the Petitioner was not distorting information or malingering. Dr. Pendergrass said that he was given reports of interviews with a long list of the Petitioner's family and acquaintances that Dr. Meyer did not appear to have.

Dr. Peter Brown testified as an expert psychiatrist. He said that he met with the Petitioner three times before his trial, in 2000 and 2001, and then again after the trial. In completing his psychiatric report, the doctor reviewed the reports of Dr. Meyer and Dr. Pendergrass, interviews with the Petitioner's family and friends, and the Petitioner's family history and records. He opined that the Petitioner's childhood was "chaotic," noting that the Petitioner's mother was sixteen and his father was nineteen when he was born. Dr. Brown described the Petitioner's relationship with his mother as "complicated." The doctor found a pattern of "repeated decompensation emotionally and behaviorally," where the Petitioner was unable to express his feelings or thoughts, and he would send messages by other means, such as setting fires. Dr. Brown explained that fires are a universal sign of danger and alarm, and the fires were used by the Petitioner to express his distress. In school, the Petitioner was a "classic outsider and classic scapegoat." Frequent moves contributed to the Petitioner's instability. The Petitioner turned to alcohol, and later drugs, to deal with the chaos in his life. Dr. Brown testified that there was evidence in a report that the Petitioner told a cousin that he had sex with Hughes once, which coincided with Dr. Wright's evaluation in which the Petitioner reported one episode of homosexual behavior. Dr. Brown said that, although the Petitioner denied sexual abuse allegations, there were a host of social and psychological explanations for the denial.

Dr. Brown further testified that the four or five episodes where the Petitioner burned property in 1990 and 1991 followed the same pattern as those during the Petitioner's childhood, in that they signaled that the Petitioner was trying to send a message to someone important to him or with whom he had an emotional conflict. Dr. Brown said that the fires were also "strongly predictive of significant psychiatric disorder." He noted that, before the victim's death, the only injury that resulted from the fires was when the Petitioner had accidentally burned himself. The doctor said that the Petitioner's relationship with the victim was clearly the most significant relationship he had ever had, apart from his relationships with his parents and family. The Petitioner's and victim's relationship involved significant verbal and physical fights, and "true to his previous pattern, [the Petitioner] never won a fight." Dr. Brown testified that repeated breakups would have left the Petitioner experiencing the same anxiety and extreme disorganization he felt during childhood. In the weeks leading to the victim's death, the Petitioner was using drugs and alcohol heavily, and there was evidence that his emotional disorganization and confusion had increased. Dr. Brown said that the Petitioner tried to retrieve some of the victim's items that he had pawned to buy drugs, and this

was a significant indicator of his feelings toward her. On the day of her death, the Petitioner was binge drinking and trying to find the victim, he had angry confrontations with her family members, and he purchased gasoline. Dr. Brown testified that "the most probable explanation is that he intended to send a message, that he intended to burn her vehicle," which he had threatened to do earlier that week.

Dr. Brown stated that, in his discussions with the Petitioner, the Petitioner was unable to provide a consistent and reasonable account of what happened to the victim. He opined that this was consistent with the Petitioner's consumption of a large amount of alcohol and being in a cocaine-dependent cycle. Dr. Brown concluded that the target of the Petitioner's attack was the vehicle, not the victim. Dr. Brown stated that, as a result of his evaluation, he would strongly have recommended to Counsel that "because of his emotional makeup, [the Petitioner] would be literally the worst possible witness in his own defense." His diagnoses included chronic depression, polysubstance dependence, severe personality disorder, emotional disorganization, inability to control emotions, and tendencies toward fear and anxiety, but the doctor found no significant medical disorders. As to mitigation evidence, Dr. Brown opined that the victim's death was a "crime of passion," and there was clear clinical evidence of mitigating factors contributing to the crime.

On cross-examination, Dr. Brown said that his evaluation agreed with Dr. Meyer's evaluation in terms of diagnosis and clinical history. He said that post-conviction counsel directed him to find out whether there was evidence of premeditation and specific intent and/or evidence of specific mitigating factors related to the crime. The doctor's determination of the Petitioner's mental state came from objective evidence of his actual behavior, including other people's accounts, and physical evidence, as opposed to the Petitioner's own account of what happened. Dr. Brown testified that he had not concluded that the Petitioner was incapable of forming an intent, but that the Petitioner's intent was directed at the vehicle, not the victim. Dr. Brown said he did not believe the victim's breaking up with the Petitioner was a plausible motive for her death because she and the Petitioner repeatedly broke up and there was no evidence that indicated that the Petitioner believed the relationship was truly over. He further testified that the victim's apparent abortions were a "possible," but not a "probable," motive for the Petitioner's actions because the evidence showed that the Petitioner wanted to be with the victim at all costs.

Dr. Brown said that, although the Petitioner intended to burn the car, it was possible that he had formulated a decision "in that instant" to burn the victim too when she would not exit the vehicle as instructed. In terms of deliberation, specific intent and premeditation, Dr. Brown concluded that the situation involved "less and less premeditation in any sense, but more reacting to events" as the Petitioner and victim confronted each other that night. Dr. Brown said that the fact that the Petitioner was sleeping when detectives came for him was a common emotional reaction that some people exhibited in response to acute stress, while others exhibited excessive alertness.

On redirect-examination, Dr. Brown testified that, in his opinion, Dr. Meyer's report omitted three areas of information: childhood sexual abuse or the environment in which the Petitioner was raised; the level and degree of substance abuse; and the issues of premeditation, specific intent, and

deliberation. Dr. Brown concluded that the Petitioner's ability to consider the consequences before he acted was "significantly impaired." Dr. Brown said he was aware of phone messages that the Petitioner had left the victim in which he told her, "I will kill you and burn your car." Dr. Brown testified that the statements were illogical and indicated someone who was, "at best, confused." He noted that threats or acts of violence were not typical for the Petitioner.

Stuart Bayne, also a licensed private investigator, testified as an expert "fire and explosion cause origin analyst." He said that he was asked by post-conviction counsel to review the evidence and to determine how the fire occurred that killed the victim. He said that post-conviction counsel specifically requested that he examine their theory that, based on the statement of a witness, Kemp, the gas was first ignited and then thrown into the car. Based on his investigation, Bayne concluded that the physical evidence did not match the State's theory at trial that the gasoline was poured on the victim and then ignited. He said that the most important piece of physical evidence supporting his conclusion was the lid of the Tupperware container in which the gasoline was initially transported. Bayne noted that the lid was partially melted and destroyed, and it had carbon deposits on it, but it was found ten feet away from the vehicle. He said that this led him to conclude that the lid was part of the initial fuel package in which the gas was ignited and then thrown to the vehicle. Based on the damage to the front of the victim's clothing, but not the back, and the burning of the inside but not the outside of her shoes, the fire damage to the inside driver's side of the vehicle, and damage to the asphalt in the street just outside the vehicle, Bayne further concluded that the victim was in the process of exiting the vehicle when she was hit by the container of gasoline.

Based upon this testimony, the post-conviction court concluded that the Petitioner had failed to prove by clear and convincing evidence that he was entitled to post-conviction relief and dismissed the post-conviction petition. It is from that order that the Petitioner now appeals. On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition for post conviction relief because: (1) Counsel and Co-counsel rendered ineffective assistance at trial; (2) the post-conviction court erroneously denied the Petitioner's request for an expert attorney to establish his claim of ineffective assistance of counsel; and (3) the death sentence violates the Petitioner's rights under the Federal and State constitutions and international law.

## II. Analysis

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The Petitioner's challenge to his conviction and sentence for first degree murder is governed by the 1995 Post-Conviction Act, which requires that allegations be proven by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Wallace v. State, 121

S.W.3d 652, 656 (Tenn. 2003); State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). This Court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. Id. (citing Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997)). Notwithstanding, determinations of whether counsel provided a defendant constitutionally effective assistance present mixed questions of law and fact. Wallace, 121 S.W.3d at 656; Nichols, 90 S.W.3d at 586. As such, our review is de novo, and we accord the conclusions reached below no presumption of correctness. Wallace, 121 S.W.3d at 656; Nichols, 90 S.W.3d at 586.

## A. Ineffective Assistance of Counsel

The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to counsel is "so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment." Gideon v. Wainwright, 372 U.S. 335, 340 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344 (1980); McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970); see also Strickland v. Washington, 466 U.S. 668, 686 (1984).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686; Combs v. Coyle, 205 F.3d 269, 277 (6th Cir. 2000). A two-prong test directs a court's evaluation of a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687. The Strickland standard applies, as well, to the right to counsel under article I, section 9 of the Tennessee Constitution. See State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

The performance prong of the Strickland test requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690; see also Kimmelman v. Morrison, 477 U.S. 365, 386 (1986). "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances

of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Combs, 205 F.3d at 278. Upon reviewing claims of ineffective assistance of counsel, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689. Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, we note that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987). Notwithstanding, we recognize that "[o]ur duty to search for constitutional [deficiencies] with painstaking care is never more exacting than it is in a capital case." Id. at 785.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In evaluating whether a petitioner satisfies the prejudice prong, this Court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (citing Strickland, 466 U.S. at 687). In other words, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome. Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002). That is, the evidence stemming from the failure to prepare a sound defense or to present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal. Code v. Montgomery, 799 F.2d 1481, 1483 (11th Cir. 1986); Nealy v. Cabana, 764 F.2d 1173, 1178-79 (5th Cir. 1985). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland." State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991); see also Chambers v. Armontrout, 907 F.2d 825, 832 (8th Cir. 1990), *cert. denied,* 498 U.S. 950 (1990). Moreover, when challenging a death sentence, the petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." Henley v. State, 960 S.W.2d 572, 579-80 (Tenn. 1997), *cert. denied,* No. 97-8880 (U.S. Tenn. Oct. 5, 1998) (citing Strickland v. Washington, 466 U.S. at 695).

On appeal, the petitioner claims that his trial counsel failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions. In this regard, he asserts that they denied him the effective assistance of counsel at both the guilt and penalty phase of his trial by failing to meet these standards for capital representation:

> 1. Counsel failed to challenge the State's case that the Petitioner committed an intentional, premeditated murder;

2. Counsel failed to adequately investigate and advocate the defense theory on the fire's origin;

3. Counsel's dealings with experts was constitutionally deficient;

4. Counsel failed to adequately cooperate and consult with Co-counsel, and Co-counsel was ineffective when she did not tell the trial court that she thought that her representation ineffective;

5. Counsel failed to adequately investigate the Petitioner's case;

6. Counsel misrepresented his preparedness for this case;

7. Counsel failed to competently select a jury;

8. Counsel failed to challenge jury instructions.

## 1. Failure to Challenge State's Theory

The Petitioner first asserts that Counsel and Co-counsel failed to challenge the State's theory of the case that he committed an intentional, premeditated murder, and the Petitioner relies upon multiple arguments for this contention. First, the Petitioner contends that his trial counsels misinformed him of the consequences of pleading guilty and then attempted to have him enter a guilty plea in the presence of the jury. Second, the Petitioner asserts that Counsel told the jury, in his opening statement, that the only determination that the jury would have to make is whether the Petitioner was guilty of committing a premeditated murder, and then Counsel improperly instructed the Petitioner's expert not to discuss the day of the crime. Finally, the Petitioner asserts that this alleged failure prejudiced him.

## a. Attempted Guilty Plea

The Petitioner's first assertion is that his trial counsels misinformed him of the consequences of pleading guilty and then attempted to have him enter a guilty plea to felony murder and aggravated arson in the presence of the jury. The evidence shows that the Petitioner was on trial for three offenses: (1) first degree premeditated murder; (2) first degree felony murder; and (3) arson. When questioned by the police, the Petitioner admitted that he started the fire, but he denied that he intended to kill the victim. The State was seeking the death penalty if the Petitioner was convicted for first degree murder. In light of these facts and circumstances, Counsel and Co-counsel sought to have the Petitioner plead guilty to felony murder and aggravated arson with the aim of mitigating the Petitioner's responsibility for the crime and to spare him the death penalty. The Petitioner took the stand to enter the guilty plea, but he expressed confusion, explaining that he thought that, by entering the plea, the case would go directly to sentencing. The trial court, therefore, rejected the plea, and the jury eventually found the Petitioner guilty of first degree premeditated murder and sentenced him to death.

In hindsight, it is unclear whether the strategy of entering a guilty plea to felony murder and arson would have been successful. It is also unclear whether Counsel and Co-counsel explained the plea to the Petitioner. While the Petitioner expressed some confusion on the stand when he was attempting to plead guilty, the post-conviction court found Counsel's testimony credible that Counsel

had explained to the Petitioner the ramifications of pleading guilty. Furthermore, we will not, on appeal, second guess the strategy of pleading guilty with the intention of mitigating the sentence. We note that the Petitioner correctly points out that one of the two aggravating circumstances in this case was that the murder was committed during the course of a felony, and by pleading guilty to aggravated arson, the Petitioner admitted that this aggravating circumstance existed. However, it is clear to us, as it was to the Petitioner's trial counsel, that this element would be proven. Counsel's intent was to garner some sympathy or empathy for the Petitioner with the jury by having him take responsibility for the arson. Further, Counsel sought to make the Petitioner more credible by having him admit that he started the fire, which was sure to be proven at trial, in an attempt to have the jury believe that he did not intend to kill the victim. This strategy, while potentially flawed, will not be subject to hindsight review. Similarly, we will not second guess the strategy of having this plea entered in the presence of the jury, since the jury was responsible for sentencing the Petitioner.

Even were we to conclude that Counsel and Co-counsel erred by attempting to have the Petitioner plead guilty, and erred by doing so in front of the jury, we cannot conclude that the Petitioner has established that this error prejudiced him. At trial, the Petitioner's theory of defense was that, while he started the fire that burned the victim's car and subsequently caused her death, he did not intend to kill the victim. Therefore, he contended, he did not have the requisite intent to commit first degree premeditated murder. The Petitioner testified on his own behalf, against the advice of Counsel, to these facts at trial. Accordingly, his attempt to plead guilty to arson and felony murder did not contravene his trial strategy or his trial testimony. Under these circumstances, we cannot find that any error by Counsel or Co-counsel prejudiced the Petitioner.

### b. Expert Testimony Regarding Premeditation

The Petitioner next asserts that Counsel was ineffective because he told the jury, in his opening statement, that all they must decide is whether the Petitioner acted with premeditation, however, Counsel had "instructed" Dr. Meyer not to discuss the day of the crime with the Petitioner. The Petitioner states that this prejudiced him because the trial court excluded Dr. Meyer's testimony from the guilt phase of the trial based upon its finding that the evidence was not relevant. Further, the Petitioner asserts he was prejudiced because the jury did not hear a comprehensive psychological explanation of the Petitioner's behavior at the time the crime took place, that would potentially negate his ability to form the requisite intent. The Petitioner offered the testimony of a clinical psychologist, Dr. Pendergrass, and a psychiatrist, Dr. Brown, to prove that such an explanation was available. The State counters that Counsel made a tactical decision to reduce the possibility of further inconsistent statements by instructing Dr. Meyer not to interview the Petitioner about the day of the murder and that tactical decision should not be second-guessed on appeal. The State also asserts that the testimony of Drs. Pendergrass and Brown was substantially similar to the testimony of Dr. Meyer. The post-conviction court held:

> [Counsel] informed Dr. Meyer of all the relevant facts surrounding the offense. In an effort to avoid additional statements from the defendant, he asked Dr. Meyer not to elicit unnecessary statements about the offense from the defense. Counsel was

aware that while the defendant consistently admitted his guilt to the offense, the defendant had also given inconsistent . . . statements about the offense and [Counsel] did not want the defendant to make any <u>unnecessary</u> statements which could potentially be discovered by the state and used for impeachment.  Counsel already knew that the defendant did not make a good witness based upon his pretrial hearing testimony.  The defendant had seemed very cold in that testimony.  One of the expert witnesses at the post-conviction hearing testified that the defendant was his own worst enemy as a witness.  Counsel's tactical decision to try to limit the number of inconsistent statements made by the defendant did not unduly limit the evaluation.  The "reasonableness of counsel's [decision] may be determined or substantially influenced by the defendant's own statements or actions."  <u>State v. Nichols</u>, 90 S.W.3d 576, 587 (Tenn. 2002) (quoting <u>Strickland</u>).

We conclude that the Petitioner has not proven that Counsel was ineffective when he instructed Dr. Meyer not to interview the Petitioner about the day of the murder.  It was clearly a tactical decision on Counsel's part. Counsel knew that the Petitioner had made previous inconsistent statements, and, in light of the strength of the evidence against the Petitioner, Counsel wanted to avoid more inconsistent statements.  Again, we will not second-guess tactical decisions on appeal.

Further, even if we were to conclude that Counsel was ineffective, the Petitioner has not proven prejudice.  The testimony offered by the Petitioner to prove prejudice was the testimony of Dr. Pendergrass and Dr. Brown.  Dr. Pendergrass testified that the Petitioner was clearly the aggressor at the time of the offense, and he testified that it was possible for the Petitioner to "premeditate" after the victim refused to get out of the car.  Similarly, Dr. Brown testified that the Petitioner had the specific intent to burn the car, but he did not intend to burn the victim.  Dr. Brown conceded that the Petitioner could have formed the necessary intent toward the victim.  In light of this evidence, we cannot conclude that this evidence shows clearly and convincingly that the Petitioner was prejudiced by Counsel's decision not to have Dr. Meyer interview the Petitioner about the day of the murder.  Both doctors conceded that the Petitioner could have formed the requisite intent, and neither testified that, because of intoxication or a mental disease, the Petitioner's forming this intent was impossible.  Furthermore, much of their testimony was substantially similar to Dr. Meyer's testimony.  Accordingly, we conclude that the Petitioner has not met his burden of proof in this regard and is not entitle to relief.

### 2. Failure to Uncover Allegations That The Petitioner Was Sexually Abused

The Petitioner next asserts that Counsel failed to uncover that the Petitioner had been sexually abuse, and this failure undermined the mitigating circumstances in this case because it undercut the results of Dr. Meyer's psychological testing.  The State counters that the Petitioner consistently denied ever being sexually abused, and presented no proof of such during the post-conviction proceedings.  Therefore, the State contends, the Petitioner did not meet his burden of proof. Concerning this issue, the post-conviction court found that "the record does not establish that [C]ounsel was either deficient or that the [Petitioner] was prejudiced in any way . . . ."  We agree

with the post-conviction court. Prior to the Petitioner's trial, the Petitioner continually and consistently denied that he was sexually abused. The Petitioner did disclose to a doctor that he had had one previous homosexual encounter, but he denied that he had ever been the victim of any sexual abuse. Because of the Petitioner's continuous denials, the only evidence that Counsel had was the suspicion of the Petitioner's mother that he may have been abused. In light of the Petitioner's direct denial of any abuse, we cannot now conclude that Counsel was ineffective for failing to uncover alleged sexual abuse. Of note, the Petitioner's post-conviction counsel was also unable to locate the alleged perpetrator of this abuse for the post-conviction proceedings. The "reasonableness of counsel's [decision] may be determined or substantially influenced by the defendant's own statements or actions." Nichols, 90 S.W.3d at 587. Here, the Petitioner's denials substantially support the reasonableness of Counsel's decision not to pursue this issue. The Petitioner is not entitled to relief on this claim.

### 3. Failure to Adequately Investigate the Origin of the Fire

The Petitioner next asserts that Counsel was ineffective by failing to adequately investigate and advocate the defense's theory of the origin of the fire. He contends that Counsel should have secured the assistance of experts, and the TVA engineer that Counsel consulted was not an adequate expert. Further, he asserts that Counsel did not properly cross-examine State experts, allowing the State to present a theory of the fire's origin that was not supported by the facts. The State counters that whether the gasoline was thrown or poured was not an issue that was apparent prior to trial. Further, it contends that, when the issue became apparent, Counsel attempted to obtain the services of an arson expert pre-trial, but the trial court denied his request. Finally, the State asserts that the testimony of a fire expert, who would have presumably testified similarly to the fire expert who testified at the post-conviction hearing, would not have changed the outcome of the trial. The post-conviction court found:

> A motion for an arson expert was filed by [C]o-counsel . . . just before trial and overruled as untimely filed and due to no showing of any particularized need. [Counsel] also testified that he in fact had spoken with several individuals including an engineer from TVA named Mike Mathis about the fire and car damage in an effort to learn more and to develop any potential evidentiary issues. He stated that he asked fundamental type questions and that he was aware that there was no way it had been done with a coke bottle like the [Petitioner] had said. This inconsistency along with others bothered [C]ounsel and limited his actions on the [Petitioner's] part. The [Petitioner] did not change this part of his story until he testified at trial.

> The [P]etitioner presented Stuart Bayne, a fire investigator, to testify at the post-conviction hearing. Although he testified that he disagreed with the state's theory of how the fire occurred exactly, his report indicated that the victim had most of the gas on her person. His opinion was that the gas was thrown. This, however, is consistent with part of the trial testimony. Dr. Merriman stated that the victim had said that the [Petitioner] threw the gas on her and in closing, it was argued that the gas was either

-28-

poured or thrown. It was also important to note that the issue of poured or thrown did not become important until the [Petitioner] began changing his story during trial.

After carefully reviewing the record, this court finds that the [P]etitioner has failed to establish either that [C]ounsel was ineffective or that he was prejudiced in any way on this issue.

### a. Failure to Obtain a Fire Expert

We conclude that the post-conviction court did not err when it held that the Petitioner failed to establish that Counsel was ineffective. Prior to trial, the subject of whether the gas was thrown or poured on the victim was not an issue. Therefore, Counsel's failure to obtain an expert to testify that the gas was thrown, rather than poured, did not fall below an objective standard of reasonableness. The Petitioner points to evidence from the victim's clothes and shoes that support a theory that the gas was thrown rather than poured, and, therefore, Counsel should have conducted further investigation. However, the victim's own statements were that the Petitioner threw gas on her, and that issue did not appear to be contested. Additionally, Counsel's theory of the case was that the Petitioner did not have the requisite mental state to commit first degree murder, not that he threw rather than poured gas on the victim. We again note that we do not evaluate Counsel's actions in hindsight, but, based on the facts known to Counsel at the time of trial. Further, there was evidence presented at the trial that the gas was thrown at the victim. Under these circumstances, we cannot conclude that Counsel was ineffective. Furthermore, even if we were to conclude otherwise, the Petitioner has not proven prejudice. Again, pursuant to Strickland, a showing of prejudice requires that Counsel's errors were so serious as to deprive the Petitioner of a fair trial, a trial whose result is reliable. Strickland, 466 U.S. at 687. Prejudice was clearly not shown by the Petitioner.

### b. Failure to Object to Expert Qualifications

The Petitioner asserts that Counsel was ineffective for failing to adequately cross-examine the State's experts. Specifically, he contends that Counsel failed to object to the qualifications of Ed Forester, Mike Donnelly, and Sonya Merriman. While he concedes that Forester and Donnelly, "appear to possess the experience necessary to qualify as an expert witness . . .", he takes issue with their failure to detail their methodology. Further, he contends that Dr. Merriman's testimony went beyond her area of expertise.

Generally, expert testimony is necessary when the subject matter requires that the court and jury have the aid of knowledge or experience not held by ordinary witnesses, Lawrence County Bank v. Riddle, 621 S.W.2d 735, 737 (Tenn. 1981), and where common knowledge furnishes no criteria for judgment or where proof depends on observation and analysis outside the common experience of jurors, expert testimony is required to establish the proof. This Court has cited the following from American Jurisprudence:

> A jury . . . is often confronted with issues which require scientific or specialized knowledge or experience in order to be properly understood, and which are not subject to an intelligent determination simply on the basis of deductions made and inferences drawn from ordinary knowledge, common sense, and practical experience gained in the ordinary affairs of life . . . . On such issues, the testimony of a witness with special knowledge and skill is *required* in order to arrive at an intelligent conclusion.

Id. (citing 31A Am. Jur. 2d § 32 (1989) (emphasis added)).

Expert scientific testimony is admissible "if scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Tennessee Rules of Evidence 702. The factors to test admissibility are whether the hypotheses are falsifiable, refutable, or testable, whether the expert's theory has been subjected to peer review and publication, or for a particular scientific technique, the known or potential rate of error and the general acceptance of the theory. Daubert v. Merrill-Dow Pharmaceuticals, Inc., 113 S. Ct. 2786, 2796-2797 (1993).

Under Daubert the scientific testimony need not be known to a certainty. However, the Daubert court renders the trial judge a "gatekeeper" on the admission of expert scientific testimony. The court teaches that when scientific testimony is proffered, it is the trial court's responsibility to determine whether the expert is testifying to scientific knowledge that will assist the trier of fact to understand and determine a factual issue, which determination entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid, and whether that reasoning or methodology properly can be applied to the facts at issue. Id. at 2796. Daubert requires the trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 2795

In the case under submission, the Petitioner, in his first direct appeal, argued that the trial court improperly allowed Donnelly to testify that the gasoline was "poured rather than thrown" on the victim. State v. Leroy Hall Jr., No. 03C01-9303-CR-00065, 1996 WL 740822, at *14 (Tenn. Crim. App., at Knoxville, Dec. 30, 1996). This Court held that, because there was no proper objection at trial, we would not fault the trial court or the State for not presenting a greater foundation for the opinions that Donnelly gave. However, we noted that "expert testimony regarding the nature of accelerants or the paths that fires take is not uncommon." Id. at *15. In accordance with this opinion, and the relevant law, we conclude that Counsel was ineffective for failing to ask that the methodology employed by Donnelly in reaching to his conclusions be examined by the trial court. However, the Petitioner has not shown how this prejudiced him. At the post-conviction hearing, the Petitioner did not call Donnelly to inquire as to his methodology, and to show how this methodology was faulty. Furthermore, he presented no evidence at all that would show how Donnelly's methodology was flawed. Therefore, we conclude that there is no prejudice in this regard, and the Defendant is not entitled to relief.

Similarly, and for the same reasons, we conclude that the Petitioner cannot show how Counsel's failure to inquire as to the methodology that Forester employed caused the Petitioner prejudice.

Finally, we address whether Counsel was ineffective for failing to object when Dr. Merriman allegedly testified outside the scope of her area of expertise. The Petitioner concedes that Dr. Merriman is "admittedly qualified to testify as a treating physician," but he contends that the doctor testified outside her area of medical expertise when she said that the victim was "doused" with gasoline. Counsel testified that he believed that Dr. Merriman was qualified to opine about whether the victim had been splashed or doused with gasoline, and he thought that this opinion was, in fact, in her area of expertise. Counsel noted that, because the victim received third-degree burns to 96 or 97 percent of her body, he thought that whether the gasoline was splattered or doused was not the issue. His theory was that the Petitioner, when he either splattered or doused the victim with gasoline, did not have the requisite mental state for premeditated murder. This is a viable theory of the case, and, again, whether the gas was "thrown," "splattered," "poured," or "doused" was not at issue until the Petitioner made it so. In light of these circumstances, we conclude that Counsel was not ineffective for failing to object to Dr. Merriman's testimony. Furthermore, we conclude that the Petitioner did not show prejudice.

### 4. Failure to Utilize Psychiatric Experts

In addition to Counsel's failure to obtain a fire expert, which we previously held was not ineffective, the Petitioner contends that Counsel was ineffective when he failed to filed a motion to obtain ex parte psychiatric services for the Petitioner. The Petitioner asserts that Counsel's reliance on Dr. Meyer was misplaced and insufficient when Counsel was aware that the Petitioner had a serious drug and alcohol problem. Finally, the Petitioner asserts that the discrepancies in the time records of Counsel and Dr. Meyer "demonstrate that [Counsel] is not telling the truth about his preparation for this case." The State counters that Dr. Meyer adequately testified about the Petitioner's alcohol and drug problem and the Petitioner's antisocial personality disorder. Further, the other experts presented by the Petitioner at the post-conviction hearing admitted that Dr. Meyer's conclusions were "very, very consistent" with their own. As to the time records, the State asserts that, while Counsel's time records were not accurate about the dates, his account of the work he did on the Petitioner's case was borne out by the proof presented at the post-conviction hearing.

The post-conviction court found that the expert testimony presented by the Petitioner at the post-conviction hearing was substantially similar to Dr. Meyer's testimony. Further, it found Counsel to be a credible witness. Specifically, it stated that Counsel "testified credibly to the extensive job he did for the [Petitioner] on a very difficult case."

We conclude that the Petitioner has not proven that Counsel's performance was deficient in this regard. Counsel had multiple conversations with Dr. Meyer, and Counsel was aware what the psychiatric testimony would be at trial. Further, Counsel concluded that this testimony was sufficient about the Petitioner's drug and alcohol problem. Counsel's decision not to call another

expert is one of trial strategy, and we will not second-guess that decision on appeal. Even were we to conclude that the Petitioner had shown that Counsel's performance was deficient, we could not conclude that the Petitioner proved prejudice. As noted by the post-conviction court, the expert testimony presented at the post-conviction hearing was substantially similar to Dr. Meyer's testimony at the Petitioner's trial. Under these circumstances, we cannot conclude that the Petitioner has shown that he was prejudiced by any alleged deficient performance by Counsel in this regard.

### 5. Failure of Counsel to Cooperate With Co-counsel

The Petitioner asserts that Counsel was ineffective for failing to consult with Co-counsel. He points to the lack of scheduled meetings between the two and the discrepancy in the time records of Counsel and Co-counsel. The State counters that Counsel may have been inaccurate about the dates that meetings occurred, but there is no indication that his testimony that he spent over 1000 hours on this case was untruthful. The post-conviction court held:

> [C]ounsel's choices were substantially influenced by the [Petitioner's] own statements and actions. According to [Counsel], the [Petitioner] himself changed details in his story several times. With regard to certain facts, the [Petitioner] testified differently at trial than in any of his pretrial statements and interviews. In addition, [Counsel] advised [the] [P]etitioner not to testify because he had come across as a very cold witness at the preliminary hearing. Clearly the [P]etitioner contributed to any difficulties that [C]ounsel may have had both in preparation and at trial.

> [Counsel] also testified that his time records were not always accurate and that he had met with the [Petitioner] more often than the records reflected. [Counsel] admitted that he did not have a great deal of contact with [C]o-counsel but stated that as lead counsel he took control of the investigation and preparation of the case. It was established that there had been some problems in a prior case that [Counsel] had handled with the Public Defender's Office and that this was the basis for his caution in dealing with that office.

> [Co-counsel]'s efforts were focused on mitigation and legal issues. [Co-counsel] filed an extremely large number of requested jury charges which related to mitigation. Several of these which the court found to be non-duplicitive of the existing charge were granted.

> Although it did not work as evidenced by the verdict, the defense theory of not fighting the felony murder and arson charge in an attempt to take responsibility for the consequences and limit the state's proof was a viable tactic. After initial interviews, the [Petitioner] had never denied setting the fire and the victim clearly died as a result of her injuries. The defense attempted to show that the [Petitioner] was remorseful and that he had not acted with premeditation. This tactical decision

will not now be judged by 20-20 hindsight. . . .

Both attorneys testified that portions of their files were missing.

The record establishes that members of the defense team met with the [Petitioner] and investigated both phases of the trial. [Counsel] testified credibly that he met a great deal with his client.

It is noted that [Co-counsel] essentially stated that she felt she had been ineffective. However, [Counsel] testified credibly to the extensive job he did for the [Petitioner] on a very difficult case. Even assuming that [Co-counsel] may have been derelict in her representation of the [P]etitioner at times, no prejudice may be shown on the record based upon the [P]etitioner's competent representation by [Counsel].

After a thorough review of the trial record of this case the court concludes that the [P]etitioner has failed to establish that he is entitled to any relief on this issue.

We conclude that the post-conviction court did not err when it held that Counsel was not ineffective in this regard. The post-conviction court found that Counsel testified credibly about the extensive amount of time that he spent preparing the Petitioner's defense, and the evidence does not preponderate against this finding. Counsel adequately prepared for the Petitioner's trial, and he attempted to provide the Petitioner a successful defense. While Counsel may not have adequately communicated with Co-counsel, this does not make his representation of the Petitioner ineffective. Furthermore, even were we to conclude otherwise, the Petitioner has not proven that he was prejudiced by Counsel's alleged lack of adequate communication with Co-counsel. We agree with the post-conviction court's finding that the Petitioner is not entitled to relief on this issue.

### 6. Failure to Adequately Investigate Case

The Petitioner asserts that Counsel was ineffective because he failed to adequately investigate the Petitioner's case. The Petitioner contends that Counsel should have used the investigators from the Public Defender's office in addition to Investigator Mitchell. The Petitioner also contends that the discrepancies in the time records of Counsel and Investigator Mitchell demonstrate Counsel's untruthfulness. Finally, the Petitioner contends that the evidence preponderates against the post-conviction court's finding that Counsel throughly investigated the Petitioner's history. The State counters that Investigator Mitchell acknowledged that he engaged in "many hours of conversations" with Counsel about this case. The Public Defender's investigator also testified that he met with Counsel on several occasions to discuss this case. Therefore, the State asserts that, while the dates reflected in Counsel's time records may be inaccurate, there is no indication that Counsel was untruthful. Furthermore, the State contends, the Petitioner has not shown prejudice.

The post-conviction court held:

-33-

[Counsel] testified to his extensive experience in capital litigation and to the various seminars he had attended. [Co-counsel] testified to her extensive experience in criminal defense work as well. These attorneys were clearly qualified to handle a capital case.

[Counsel] throughly investigated the case and attempted to prepare a defense to a very difficult set of facts. Again, this court notes that [C]ounsel was somewhat limited by the [Petitioner's] own statements and actions. After initial interviews, the [Petitioner] never denied having set the fire. A few witnesses testified at the post-conviction hearing who did not testify at trial. These witnesses, however, would have been primarily cumulative of the other evidence already presented at trial and most of them also had portions of their testimony which would have had a negative impact on the jury about either the [Petitioner] or his relationship with the victim. [Counsel] testified that there were more threats by the [Petitioner] against the victim than the authorities were aware of and that he had not made written notes on these. Some witnesses even said the [Petitioner] had threatened to burn [the victim] which would have made the "poured" theory even stronger. Some of the witnesses also admitted that they had conveyed certain facts to the defense at the time of trial even though they had been interviewed. Counsel testified that he tried to present favorable information and limit unfavorable information, such as the sale of drugs by the [Petitioner]. Some witnesses indicated they would have invoked their own Fifth Amendment rights on any drug use testimony.

. . . .

The record does not establish that [C]ounsel was ineffective nor that there was any prejudice on these issues.

We conclude, as did the post-conviction court, that Counsel was not ineffective in his investigation of the Petitioner's case. Counsel hired Investigator Mitchell, and the evidence shows that Counsel and Investigator Mitchell had multiple conversations about this investigation. Further, Counsel discussed this case with multiple experts, and he met with the Petitioner on multiple occasions about the case. Counsel attempted to present an adequate and successful defense in the face of a very difficult set of facts. The Petitioner hurt his own defense when he chose to testify against Counsel's advice and changed his testimony at trial. Counsel chose not to call witnesses that Counsel thought would be cumulative. This is, again, an issue of strategy that we will not second-guess. Accordingly, we hold that the Petitioner has not proven that Counsel's investigation was inadequate, and he has further not shown how Counsel's alleged inadequate investigation has prejudiced him.

### 7. Counsel's Misrepresentation of Extent of Preparation of Case

The Petitioner next asserts that Counsel misrepresented how much time he spent preparing

for this case. The State again counters that the testimony at the post-conviction court clearly shows that the dates in Counsel's records were admittedly "off," but it asserts that there is no evidence that the time records contained misrepresentations. The post-conviction court found that Counsel testified credibly about the extensive job he did for the Petitioner.

Counsel's records were admittedly inaccurate as to the dates and times that he met with other people involved in this case. This, however, does not make his representation of the Petitioner ineffective. While we note that it is a better practice to be meticulous in keeping time records, the post-conviction court found that Counsel testified credibly as to the extensive job that he did for the Petitioner. In light of this finding, we conclude that Counsel's performance was deficient because of inaccurate time records. Further, we conclude that the Petitioner has not proven how any error in the time records has prejudiced him.

### 8. Failure to Competently Select Jury

The Petitioner contends that Counsel failed to competently select a jury because he failed to conduct an adequate voir dire about: (1) jurors' ability to give effect to mitigating evidence; and (2) the death qualifications of jurors. The State counters first that the trial transcript, including the voir dire proceedings, are not a part of the record. Further, the State asserts that the Petitioner failed to show that any of the jurors were unable to follow the law as instructed by the court. The post-conviction court found that:

> Specifically, [the] [P]etitioner claims that [C]ounsel was ineffective in failing to object to the excusal of juror Evelyn Taylor, who was opposed to the death penalty, and in failing to exclude jurors Dianne M. Jones and Cynthia Taylor, whose opinions would lead them not to listen to and give effect to mitigating evidence. The record, however, establishes that this court properly applied the appropriate legal standards during the jury selection process of these questioned individuals.
>
> After throughly reviewing the record, this court finds that the [P]etitioner has failed to establish either ineffective assistance of counsel or prejudice on this issue.

The Petitioner has not made the trial transcript part of the appellate record. "When a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993); see Tenn. R. App. P. 24(b); State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). Generally, when the appellate record is inadequate, the appellate court is precluded from considering the issue, and the trial court's ruling is presumed correct. See State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991); State v. Matthews, 805 S.W.2d 776, 748 (Tenn. Crim. App. 1990); State v. Roberts, 755 S.W.2d at 836. Without the transcript of the voir dire proceedings, we must presume that the post-conviction court's ruling was supported by the evidence. Accordingly, we conclude, as did the post-conviction court, that Counsel was not ineffective for failing to conduct an adequate voir dire, and we hold that the Petitioner is not

entitled to relief on this issue.

## 9. Failure to Challenge Jury Instructions

Finally, the Petitioner contends that Counsel was ineffective for failing to challenge the following jury instructions: (1) the State's use of the "overly broad and unconstitutional aggravating factor, 'heinous, atrocious or cruel';" (2) the reasonable doubt instruction; and (3) the instruction regarding when the death penalty is mandatory. The State counters that the "heinous, atrocious or cruel" enhancing factor has repeatedly been upheld on appeal, the reasonable doubt instruction was valid, and the jury instruction regarding the mandatory statutory sentencing schemes have been approved by the United States Supreme Court and by the Tennessee Supreme Court.

The post-conviction court found that:

(A) the [P]etitioner first challenges [C]ounsel's failure to object to the reasonable doubt instructions at both phases of the trial. These instructions have repeatedly been held to be constitutional by the courts of this State and thus, the [P]etitioner is not entitled to relief on this claim.

(B) The [P]etitioner next challenges [C]ounsel's failure to request that the charge on aggravating factor (I)(5) state that the defendant "intended" to inflict serious physical abuse. This issue, however, is without merit. State v. Blanton, 975 S.W.2d 269, 280-81 (1998), cert. denied, 525 U.S. 1180 (1999); State v. Odom, 928 S.W.2d 18, n.5 (Tenn. 1996).

(C) The [P]etitioner also challenges [C]ounsel's failure to challenge both the charge and any argument that the death penalty is mandatory under certain circumstances citing Tenn. Code Ann. § 39-13-204(g). This issue is also without merit. See State v. Bane, 853 S.W.2d 483, 488-89 (Tenn. 1993).

We conclude that Counsel was not ineffective for failing to challenge these three jury instructions. The Tennessee Supreme Court has repeatedly rejected the contention that the heinous, atrocious, or cruel aggravating circumstance is overly broad. Terry v. State, 46 S.W.3d 147 (Tenn. 2001). Similarly, the Tennessee Supreme Court has rejected arguments regarding the constitutionality, or unconstitutionality, of the reasonable doubt instruction. Ownes v. State, 13 S.W.3d 742, 765 (Tenn. Crim. App. 1999); see Nichols v. State, 877 S.W.2d 722, 734 (Tenn. 1994). Finally, the Tennessee Supreme Court has approved the use of mandatory statutory sentencing schemes, which the trial court instructed the jury about in this case. See State v. Bane, 853 S.W.2d 483, 488-89 (Tenn. 1993). In accordance with this authority, the Petitioner has not proven that Counsel was ineffective for failing to object to these instructions or that he was prejudiced by Counsel's actions.

## B. Refusal to Permit Testimony of Expert Attorney Witness

The Petitioner challenges the post-conviction court's denial of the Petitioner's request for an expert attorney to testify about whether the Petitioner's trial counsel performed within the established standard of practice and whether the Petitioner was prejudiced as the result of his counsels' performance. The Petitioner contends that his case required the post-conviction court to identify the standard of care for reasonably competent criminal defense attorneys in cases involving "complex mental health issues" and that the testimony of the proposed expert attorney could have provided substantial guidance to the post-conviction court. The Petitioner concludes that the failure to allow his expert attorney to testify violated his rights to Due Process, and he seeks remand for a "full and fair hearing."

During the final day of the post-conviction hearing, post-conviction counsel informed the post-conviction court that their expert attorney, Michael Meirs, was in trial in Georgia and would not be able to testify as expected on that date. Counsel requested a continuance or, in the alternative, that they be permitted to take Meirs' deposition and file it for the record. The post-conviction court found that Meirs' absence did not warrant a continuance,[1] and further noted that it was not clear "without hearing the witness testify, if the court's even going to allow him to testify, or find out if what he has to say is relevant and probative . . . ." The post-conviction court further observed that this was not its first death penalty case and that there were numerous Tennessee Supreme Court and United States Supreme Court decisions "that talk about the level of competency of attorneys in death penalty cases." The trial court further declined the requested deposition. Following the hearing, the post-conviction court entered an order denying the Petitioner's alternative motions to accept the affidavit of Meirs as substantive evidence or to reopen the proceeding to permit him to testify.[2]

Before this Court, the Petitioner begins by noting that he was denied requested funding for an expert attorney and couches his argument in terms of the post-conviction court's "refusal to grant [his] request for an attorney expert to testify . . . ."[3] It is clear, however, that the Petitioner in fact secured the services of an expert attorney but did not ensure that he would be available at the post-conviction hearing. Under these circumstances, the post-conviction court refused to grant a requested continuance.

The decision to grant a continuance is a matter for the discretion of the trial court and will not be overturned on appeal absent an abuse of discretion. State v. Robinson, 146 S.W.3d 469, 517 (Tenn. 2004). To establish an abuse of discretion, the complaining party must make a clear showing of prejudice as a result of the continuance being denied. Id.

---

[1] The record reflects that the evidentiary hearing was held on May 13-15, 2002, and March 26-27, 2003.

[2] The referenced motion does not appear in the record on appeal.

[3] As the State correctly observes, the record contains neither the motion for expert services nor the order denying the requested funds.

In the case under submission, we conclude that the Petitioner has not shown that the post-conviction court abused its discretion by denying his motion for continuance. As the post-conviction court noted, the Petitioner was given plenty of time to prepare for the post-conviction hearing, which had already been continued multiple times. Further, the hearing took place over five days between May of 2002 and March of 2003, and the Petitioner's expert attorney was not present on any of those days. Further, the testimony of the expert attorney would not have necessarily been helpful to the post-conviction court, which, in its many years of experience, has ruled upon many post-conviction petitions. Accordingly, we cannot conclude that the post-conviction court abused its discretion in this regard. This issue is without merit.

### C. Death Sentence under Apprendi v. New Jersey

The Defendant contends that the sentence of death in this case violates the Constitutional principles announced by the United States Supreme Court in Apprendi v. New Jersey, 530 U.S. 466 (2000), because the aggravating factors that made the Petitioner eligible for a sentence of death, and which the jury found to have applied when it sentenced him to death, were not included in the indictment returned by the grand jury. The State responds that the Tennessee Supreme Court has repeatedly denied relief on this issue. The post-conviction court held that this issue was waived and, if not waived, was without merit.

In State v. Berry, 141 S.W.3d 549 (Tenn. 2004), the Tennessee Supreme Court addressed the specific issue raised by the Petitioner in this case. In Berry, the defendant asserted that the indictment was constitutionally defective because it failed to charge the aggravating circumstances relied on by the State to sentence him to death. The defendant cited Apprendi v. New Jersey and Ring v. Arizona. In response to that contention, the Tennessee Supreme Court disagreed that aggravating circumstances must be charged in the indictment. Berry, at 561. The Court held that Rule 12.3 of the Tennessee Rules of Criminal Procedure, which requires that written notice of the State's intention to seek the death penalty be given to a defendant at least thirty days prior to trial and include the aggravating circumstances upon which it intends to rely, satisfies the constitutional requirements of notice. Id. at 562. The Court stated, "We have previously held, and we continue to find, that the provisions of Rule 12.3 satisfy the constitutional requirements of notice." Id. (citations omitted). Further, it stated, "So long as adequate notice and opportunity for hearing is provided for by our statutory scheme, aggravating circumstances need not be included in the indictment." Id.

In this case, we must follow the Tennessee Supreme Court's holding in Berry. Accordingly, we conclude that the State is not required to include the aggravating circumstances in the indictment. Further, because the State complied with Rule 12.3 of the Tennessee Rules of Criminal Procedure, the Petitioner had adequate notice that the State intended to seek the death penalty. The Petitioner is not entitled to relief on this issue.

## D. Constitutional Arguments

The Petitioner next contends that his sentence of death should be set aside because it violates various provisions of the Constitutions of the United States and the State of Tennessee and international law. In response, the State asserts that similar arguments have been rejected by courts of this state. We conclude that the Petitioner has failed to raise any constitutional claim with respect to the death penalty that has not already been rejected by the appellate courts of this State. See e.g., State v. Odom, 137 S.W.3d 572, 599 (Tenn. 2003); State v. Stevens, 78 S.W.3d 817, 850-52 (Tenn. 2002); State v. Keen, 31 S.W.3d 196, 233 (Tenn. 2000); State v. Nesbit, 978 S.W.2d 872, 902 (Tenn. 1998), State v. Vann, 976 S.W.2d 93, 117 (Tenn. 1998), State v. Caughron, 855 S.W.2d 526, 542 (Tenn. 1993). Accordingly, the Petitioner's claim on this issue must fail.

## IV. Conclusion

In accordance with the aforementioned reasoning and authorities, we conclude that there exists no reversible error in the judgment of the post-conviction court. Accordingly, we affirm the post-conviction court's dismissal of the Petitioner's petition for post-conviction relief.

_____
ROBERT W. WEDEMEYER, JUDGE